UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Michael D. Loos,                                    Case No. 13-cv-3373 (PAM/FLN)

          Plaintiff,

v.                                                  **MEMORANDUM AND ORDER**

BNSF Railway Company,

          Defendant.

_____

This matter is before the Court on BNSF's Motion for Summary Judgment and alternative Motion for Separate Trials. For the reasons that follow, the Court grants in part and denies in part the Motion for Summary Judgment and denies the Motion for Separate Trials as moot.

**BACKGROUND**

In this railroad-employment dispute, Michael Loos is suing BNSF Railway Company for firing him after he engaged in protected conduct. For fifteen years, Loos worked at BNSF's Twin Cities Division as a conductor, brakeman, and switchman. (Miller Aff. (Docket No. 42) Ex. D, at 22:12-25.) Before his discharge, however, his history with the company was marked by three relevant circumstances: his attendance record, his safety efforts, and his workplace injury.

**A.  Attendance Record**

    **1.  BNSF's Attendance Policy**

Like most employers, BNSF maintains an attendance policy that requires its employees to report to work regularly. (Id. Ex. A, at 1.) Under the policy, BNSF

reviews an employee's compliance with its requirements over every three-month rolling period and assesses violations based on the number of days the employee is absent during that period. (Id.)

Each employee may take a certain number of absences each three-month period. (Id.) But when an employee exceeds the permitted threshold, BNSF may discipline him progressively. (Id.) The first attendance violation results in a formal reprimand, the second in a 10-day record suspension, the third in a 20-day record suspension, and the fourth in discharge. (Id. at 3.) An employee may also be subject to discharge if he garners three attendance violations in a single year and has an active "Level S" violation[1] on record. (Id.) An attendance violation stays active until the employee works a full year without a new violation. (Id.)

Not every absence counts against the employee. (Id.) The attendance policy excludes rest days, various forms of paid time off, and approved medical leaves. (Id. at 1.) An employee who needs time off for an on-duty injury is also eligible for an excused absence, if he submits supporting medical documentation and obtains BNSF's approval. (Id. Ex. B; Ex. C, at 42.)

### 2.     Loos's Attendance Record

Throughout his employment, Loos struggled to comply with the attendance policy. On August 23, 2006, he admitted an attendance violation and received a formal reprimand. (Id. Ex. E; Ex. D. at 30:15-18.) Then on September 12, 2006, he admitted a

---

[1] A "Level S" violation is a significant rule violation for which an employee receives a "Level S" suspension. (Miller Aff. Ex. A, at 3.)

second attendance violation and received a 10-day record suspension. (Id. Ex. F; Ex. D. at 37:4-5.) On July 28, 2008, he again admitted an attendance violation; this time, BNSF offered, and Loos accepted, alternative handling, which involved a discussion of future compliance with the attendance policy. (Id. Ex. I; Ex. D at 44:23-25; 45:22-25; 46:1-19.) On January 20, 2009, Loos acknowledged another attendance violation and received a formal reprimand. (Id. Ex. J; Ex. D at 53:14-25, 54:1-19.)

Two days later, Trainmaster Bill Shulund met with Loos to discuss his attendance issues. (Id. Ex. K.) Shulund advised Loos that he worked only 36.8 hours in October 2008 and 29.5 hours in November 2008. (Id.) During those months, Loos's peers worked, on average, 170 hours per month. (Id.) Shulund told Loos that his persistent failure to perform full-time work hours would be considered a violation of the attendance policy. (Id.)

Despite Shulund's warning, Loos's attendance problems continued. On June 15, 2009, Loos admitted an attendance violation and received a Level S 10-day record suspension. (Id. Ex. L; Ex. D at 56-58, 59:3-15.) On March 22, 2010, he admitted that he did not notify BNSF within 24 hours of the reason for another absence. (Id. Ex. M; Ex. D at 61:17-20.) BNSF again offered alternative handling, which Loos accepted. (Id.) One month later, on April 19, 2010, Loos admitted that he did not follow Shulund's instructions about maintaining an adequate number of work hours by repeatedly failing to report to work on multiple days. (Id. Ex. N; Ex. D at 66:19-24.) BNSF issued him a Level S 30-day record suspension and placed him on a three-year review period. (Id.)

3

In June 2010, Loos worked 87.6 hours. (Id. Ex. D, at 72:3-4.) On July 12, 2010, he met with Terminal Superintendent Phillip Mullen to discuss his inability to keep the hours of a full-time employee. (Id. Ex. D, at 71:19-23; Ex. O.) On August 9, 2010, Ned Percival, Director of Administration for the Twin Cities Division, wrote to Loos about his failure to work a full-time schedule, noting that his repeated absences revealed behavior "indicating of misconduct and/or indifference to duty." (Id. Ex. O.) The letter instructed Loos to manage his performance to meet the levels expected of a full-time employee and warned that further violations would result in discipline. (Id.)

On July 25, 2011, Loos again admitted an attendance violation and received a formal reprimand. (Id. Ex. Q.) Four months later, on November 9, 2011, he admitted a second attendance violation that year and received a 10-day record suspension. (Id. Ex. R.)

**B.     Safety Efforts**

When he attended work, Loos pursued efforts to improve safety at BNSF. On September 22, 2007, he submitted a Safety Issue Resolution Process ("SIRP") record[2] to BNSF, requesting defibrillators. (Id. Ex. D, at 15:11-14.) BNSF denied that request. (Id. Ex. H.) In addition, sometime in 2007 and early 2008, Loos served on BNSF's site safety committee for eight to twelve months. (Id. Ex. D, at 74:25, 75:1-4, 86:11-12.) He further contends that he raised other undocumented and unspecified safety concerns over his career.

---

[2] SIRP is a process through which BNSF tracks and monitors reported safety concerns from employees and holds supervisors accountable for resolving reported issues. (Leonard Aff. (Docket No. 41) ¶ 2.)

4

Loos also testified at a Federal Railroad Safety Act (FRSA) whistleblower trial. On January 30, 2012, he took the stand on behalf of former co-workers David Peterson and Paul Gunderson and against BNSF. (Id. Ex. D, 14:5-8; Holmes Aff. (Docket No. 40) ¶ 3.) He identified Peterson and Gunderson as strong safety advocates against whom BNSF had allegedly retaliated.

**C.    Workplace Injury**

Loos reported a workplace injury in 2010. On December 19, 2010, he twisted his right knee when he fell into a drainage grate covered with snow while walking between tracks in the Willmar yard. (Miller Aff. Ex. D, at 168:1-6; 170:1-13.) He missed work through May 16, 2011, until his treating orthopedist released him to work "without restrictions." (Id. Ex. D, at 129:15-17, 205:21-24; Ex. P.)

**D.    Loos's Discharge**

Loos's discharge from BNSF was ultimately triggered by his absences in May, June, and July 2012. The attendance policy allowed Loos to miss no more than 7.5 weekdays and no weekend days during this three-month period. (Id. Exs. A, S; Ex. C, at 118:4-17.) In the end, he missed a total of 8.5 weekdays and two weekend days, or a total of 10.5 days, which placed him three days over the threshold allowed under the policy. (Id. Ex. D, at 115:23-25; Ex. S.) He missed five of those days (May 2 and 9, June 7 and 22, and July 17) due to flare-ups of his knee injury. (Id. Ex. D, at 116:1-16, 121:4-6; Ex. T, at 73:17-26, 74:9-13, 77:17-20, 78:14-26, 79:17-24). One-and-a-half days were for a family emergency (June 27 and June 28/half day) and at least two days were for personal reasons (July 8 and 16). (Id. Ex. D, at 121:7-25, 122:1, 123:7-24,

124:19-21; Ex. T at 79:1-8; Ex. S.) BNSF calculated that these personal days were sufficient, by themselves, to put Loos over the threshold because July 8 was a weekend day and he was not permitted to miss any weekend days. (Id. Ex. T at 26:3-14, 28:19-25, 29:1-10; Ex. S.)

During that three-month period, Loos requested the ability to code the absences related to his knee injury using an "Injury on Duty," or "ION," code so that his absences would be excused. (Id. Ex. B; Ex. C at 43:23-25.) According to BNSF, he was prohibited from doing so because he did not provide medical documentation stating that he required the time off because of his injury. (Id.) The only documentation he provided BNSF at this point was the May 16, 2011 doctor's note, releasing him to full duty. (Id. Ex. P.)

As a result of the absences, BNSF charged Loos with violating its attendance policy and issued an investigation notice on August 10, 2012. (Id. Ex. V.) On November 16, 2012, BNSF held a formal investigation. (Id. Ex. T, at 1.)

At the investigatory hearing, Loos submitted a medical note dated November 6, 2012, indicating that he would have to miss work due to flare-ups of his knee injury. (Id. Ex. U.) The note also indicates that these issues had been present months earlier in May, June, and July 2012. (Id.) This was the first time Loos gave BNSF medical documentation restricting him from work for that period. (Id. Ex. T, at 68:11-17, 86:2-7.)

After the investigation, on November 29, 2012, BNSF fired Loos. (Id. Ex. W.) BNSF found that his absences in May, June, and July 2012 violated the attendance policy and, along with his two attendance violations the preceding year and his still-active Level

6

S violation, warranted discharge. (Id. Exs. A, W.) BNSF also stated that it considered his entire personnel record in reaching the decision. (Id. Ex. W.)

**E.     This Lawsuit**

Loos then brought this lawsuit against BNSF, asserting two claims. (Compl. (Docket No. 1).) First, he alleged that BNSF retaliated against him by firing him for engaging in protected activities—namely, for reporting a workplace injury, serving on a local safety committee, making safety complaints, testifying in FRSA proceedings, and following his doctor's treatment plan—in violation of the whistleblower protections of the FRSA, 49 U.S.C. § 20109. (Id. ¶¶ 14-17.) Second, he alleged that BNSF was negligent in creating the conditions that led to his knee injury—specifically, for failing to clear the yard of heavy snow and warn him of the dangerous conditions—in violation of the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51. (Id. ¶¶ 5-13.) He sought damages for past and future lost compensation, medical expenses, and other expenditures; and reinstatement of his position at BNSF. (Id. ¶¶ 11-12, 17.) BNSF answered, denying the allegations. (Answer (Docket No. 3).)

BNSF now moves for summary judgment on Loos's FRSA claim in its entirety and his FELA claim to the extent it arises after his discharge. In the alternative, BNSF moves for separate trials on the FRSA and FELA claims.

**DISCUSSION**

**A.     Motion for Summary Judgment**

Summary judgment should be granted if the moving party shows that there are no genuine disputes of material fact and it is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(a).  A fact is material if its resolution affects the outcome of the case.  Paine v. Jefferson Nat'l Life Ins. Co., 594 F.3d 989, 992 (8th Cir. 2010).  A dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  Id.  When evaluating a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  Marlowe v. Fabian, 676 F.3d 743, 746 (8th Cir. 2012).  To defeat summary judgment, however, the nonmoving party may not rest on conclusory allegations or denials, but "must produce probative evidence sufficient to demonstrate a genuine issue of material fact for trial."  Paine, 594 F.3d at 992 (quotation and brackets omitted).

      1.      **FRSA Claim**

The FRSA prohibits rail carriers from retaliating against employees who engage in safety-related protected activities.  49 U.S.C. § 20109.  As relevant here, the FRSA provides that a rail carrier "may not discharge . . . or in any other way discriminate against" an employee for, lawfully and in good faith, reporting a hazardous safety condition or workplace injury, testifying at an FRSA proceeding, or following a doctor's treatment plan.  Id. §§ 20109(a)(3), (a)(4), (b)(1)(A), and (c)(2).

To prove unlawful retaliation, the employee must show that (1) he engaged in a protected activity, (2) the rail carrier knew that he engaged in that activity, (3) he suffered an adverse employment action, and (4) the circumstances raise an inference that the protected activity was a "contributing factor" in the adverse employment action.  See id. §§ 20109(d)(2)(A)(i), 42121(b)(2)(B)(iii); 29 C.F.R. § 1982.104(e)(2).  Even if the employee makes that showing, the rail carrier may avoid liability by furnishing "clear and

convincing evidence" that it would have taken the same adverse employment action regardless of any protected activity. 49 U.S.C. § 42121(b)(2)(B)(ii).

BNSF does not dispute that Loos engaged in protected activities, that it knew he engaged in those activities, or that he suffered an adverse employment action. Instead, BNSF seeks summary judgment on Loos's FRSA claim on two grounds: (1) he cannot show that any protected activity was a contributing factor in his discharge, and (2) it can show that it would have fired him despite any protected activity. The first ground sufficiently justifies summary judgment on this claim.

In particular, Loos has set forth no evidence—other than irrelevant testimony, inadmissible affidavits, and unsupported conjecture—that shows his alleged protected activities contributed to his discharge. While the contributing-factor standard does not require that the employee "conclusively demonstrate the employer's retaliatory motive," it does require that the employee prove "intentional retaliation prompted by the employee engaging in protected activity." Kuduk v. BNSF Ry. Co., 768 F.3d 786, 791 (8th Cir. 2014) (quotation omitted). Because Loos has not pointed to any direct evidence of intentional retaliation, he must rely on circumstantial evidence, which may include:

> temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward the complainant after he or she engages in protected activity.

DeFrancesco v. Union R.R. Co., ARB No. 10-114, 2012 WL 694502, at *3 (Feb. 29, 2012). None of those factors supports Loos's claim.

Temporal proximity undermines the claim. The ten-month gap between Loos's most recent protected conduct—testifying in FRSA proceedings in January 2012—and his discharge in November 2012 is too remote. The gap widens to two years if measured against his injury report in December 2010 and swells to four to five years if measured against his safety advocacy from 2007 to 2008. Other courts have rejected shorter time periods as insufficient to establish a causal connection. See Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (holding that "the interval of two months . . . so dilutes any inference of causation that . . . that the temporal connection could not justify a finding in [the plaintiff's] favor on the matter of causal link"); Kuduk v. BNSF Railway Co., 980 F. Supp. 2d 1092, 1101 (D. Minn. 2013) (Davis, C.J.) (explaining that "a plaintiff cannot establish a prima facie case of retaliation based on temporal proximity alone when the termination occurred two months after the protected conduct"). In addition, BNSF disciplined Loos for violating the attendance policy before even his earliest protected conduct and the record is devoid of evidence showing that Loos's poor attendance was intertwined with any of this protected conduct—all factors that undercut the significance of temporal proximity. See Kuduk, 768 F.3d at 792 (reiterating that a temporal connection alone does not raise a genuine factual issue on retaliation when "the employer was concerned about a problem before the employee engaged in the protected activity" and the "protected activity . . . was completely unrelated to the . . . incident that led to his discharge" (quotation omitted)). Loos has not shown that any temporal connection raises an inference that his protected activities played a role in his discharge.

Nor has Loos produced any evidence of shifting or false explanations or other indications of pretext. Loos violated BNSF's attendance policy ten times in the last six years of his career and received, yet ignored, multiple opportunities to improve his attendance. BNSF consistently explained that it fired him for that chronic absenteeism.

Loos insists that the absences that triggered his discharge—those in May, June, and July 2012—should have been excused because they were due to flare-ups of his injury and he should have been able to use the ION code to excuse them. In other words, Loos argues that had BNSF allowed him to use the ION code, he would not have violated the attendance policy and BNSF would not have had grounds to fire him. But that argument fails on multiple levels. The doctor's note that Loos provided to BNSF when he asked to use the code—which said he could return to work unrestricted—rendered him ineligible to use the code. His belated attempt to justify his right to use the code by submitting a different doctor's note at the investigatory hearing cannot retroactively apply to BNSF's decision at the time. And even if his absences related to his injury had been excused, he still would have violated the attendance policy during this period. He admits that some of his absences were for personal reasons unrelated to the injury, and one of those personal days fell on a weekend day, but he was forbidden from missing any weekend days.[3] Whatever the case, Loos violated the attendance policy one too many times, and BNSF consistently explained that it was firing him accordingly.

---

[3] Loos also cites the depositions of three current and former BNSF employees (Jeff Pientka, Jeremy Brown, and Donald Mullins), who testified that BNSF permitted injured employees to layoff as necessary without adverse consequences (see McReynolds Aff. (Docket No. 50) Exs. M, O, P), to argue that BNSF's enforcement of the attendance

Further, Loos has no evidence that BNSF was antagonistic or hostile toward his protected activities, or changed its attitude toward him after he engaged in those activities. Loos merely guesses, but offers no evidence to support, that Trainmaster Wright, who presented evidence of Loos's absenteeism at the investigatory hearing, knew of his protected activities or that General Manager Albanese, who made the decision to fire Loos, had antagonism or hostility. Loos also highlights two stray remarks from his supervisors, Matt Bailey and Peter Hamell, in response to his requests to use the ION code. (See Loos's Br. (Docket No. 49) 7-8 ("You can't use it because I won't authorize it."; "We don't do that.").) Neither statement comes close to inferring any meaning other than that Loos was ineligible to use the code. Rather, the evidence in the record shows that, from 2006 to 2012, BNSF enforced its attendance policy against Loos both before and after he engaged in protected conduct.

Likewise, no evidence exists even hinting that BNSF applied its attendance policy differently toward Loos than other employees. He has pointed to no evidence of other employees with repeated attendance violations who were treated more leniently. To the contrary, BNSF has submitted uncontroverted evidence that it uniformly enforced its attendance policy against at least five similarly situated employees, none of whom engaged in the same protected activities. (See Holmes Aff. (Docket No. 40) ¶ 4; Leonard Decl. (Docket No. 41) ¶ 3.) Though Loos asserts that a fellow employee, Jack Kluver,

---

policy towards Loos was retaliatory. But again, even if BNSF allowed Loos to take excused absences for his injury, he still would have violated the attendance policy and been subject to discharge.

was allowed to use the ION code for missed time following a work injury, he utterly fails to cite any evidence in the record to support that blanket assertion.[4]

Loos has also submitted no evidence indicating that BNSF fired him for following his doctor's treatment plan for the injury. Loos persists that he missed time from work in May, June, and July 2012 because he was following the plan. But as noted above, the only information that BNSF was aware of at the time was the doctor's note releasing Loos to unrestricted work. And Loos's post-hoc submission of a doctor's note written nearly four months after the three-month period at issue conveniently outlining a treatment plan for that period contradicts Loos's position—he could not have been following a treatment plan that did not yet exist.

In the end, Loos has presented no evidence showing that his alleged protected activities were contributing factors in his discharge. All that he falls back on is conjecture—speculating that BNSF targeted him for his safety efforts, predetermined the outcome of its investigation, and fired him for pretextual reasons. For any of those conclusory allegations to create a genuine dispute of material fact for trial, however, they must be supported by evidence in the record. See Paine, 594 F.3d at 992. In light of Loos's overwhelming record of attendance violations, the several chances he received to correct his attendance problems, BNSF's consistent enforcement of its attendance policy against him both before and after he engaged in protected activities, the temporal gap

---

[4] Loos relies on the deposition or affidavit of two so-called experts, who are current and former BNSF employees William Fry and George Joyce, in an attempt to show that Loos should not have been fired and that BNSF's conduct was retaliatory. (See McReynolds Aff. Exs. L, Q.) But the Court cannot consider this testimony. Loos failed to disclose Fry as a potential witness and identify Joyce as an expert witness during discovery.

between his most recent protected conduct and his discharge, and the fact that he would have violated the attendance policy even if his injury-related absences had been excused—along with his complete failure to submit evidence giving rise to a fact issue on intentional retaliation—Loos has failed to prove unlawful retaliation under the FRSA. BNSF is entitled to summary judgment on that claim.[5]

    2.    **FELA Claim**

BNSF also seeks summary judgment on Loos's FELA claim to the extent it aims to recover damages for the loss of future earning capacity arising after his discharge. According to BNSF, those damages are solely attributable to Loos's discharge instead of his injury and are therefore not recoverable under the FELA.

The FELA creates a federal remedy for railroad employees injured because of their employer's negligence. 45 U.S.C. § 51. Among other damages, a plaintiff asserting an FELA claim may recover for the loss of future earning capacity. Bissett v. Burlington N. R. Co., 969 F.2d 727, 731 (8th Cir. 1992). When the plaintiff was discharged after he was injured, however, he may recover damages related to only the injury and not the discharge. See Pothul v. Consol. Rail Corp., 94 F. Supp. 2d 269, 271-73 (N.D.N.Y. 2000) (permitting a discharged FELA plaintiff to recover for the loss of future earning capacity following the discharge because his claim "related to his personal injuries rather than his termination"); Graves v. Burlington N. & Santa Fe Ry. Co., 77 F. Supp. 2d 1215,

---

[5] Because Loos has failed to show that BNSF retaliated against him for engaging in protected activities, the Court need not address whether BNSF has shown that it would have fired Loos despite those activities.

1219 (E.D. Okla. 1999) (allowing a discharged FELA plaintiff to present evidence on the loss of future earning capacity from the date of his discharge "as it relates to his injury").

Loos is not challenging his discharge in his FELA claim. He attempts to do that with his FRSA claim. Instead, he is seeking to recover damages suffered due to his workplace injury. The FELA claim is therefore based on the injury, not the discharge, and he may recover damages for the loss of his future earning capacity following his discharge on that basis. Further, a genuine dispute of material fact exists as to whether Loos's injury has contributed to any loss of future earning capacity, even after his discharge.

Thus, BNSF is not entitled to summary judgment on this portion of the FELA claim.

**B.    Motion for Separate Trials**

Finally, BNSF seeks separate trials on the FRSA and FELA claims should the Court deny summary judgment on the FRSA claim. As already discussed, the Court will grant summary judgment on that claim. The request for separate trials is therefore moot.[6]

**CONCLUSION**

Loos has not shown through supporting evidence that BNSF fired him for anything other than his chronic absenteeism. But Loos may recover for the loss of future earning capacity after his discharge, and whether that damage was due to his injury or his

---

[6] In addition to BNSF's motions, Loos has moved for a continuance of trial. Loos did so, however, before the Court ruled on the summary-judgment motion or placed the case on the August 2015 trial calendar. Those intervening events may change Loos's need for a continuance. The Court will deny Loos's request for a continuance without prejudice to him reiterating that request if necessary.

discharge is genuinely disputed. BNSF thus is entitled to summary judgment on the FRSA claim but not the FELA claim. Accordingly, **IT IS HEREBY ORDERED** that:

1. BNSF's Motion for Summary Judgment (Docket No. 43) is **GRANTED in part** and **DENIED in part** as set forth above;

2. BNSF's Motion for Separate Trials (Docket No. 33) is **DENIED** as moot; and

3. Loos's Motion for a Continuance of Trial (Docket No. 55) is **DENIED** without prejudice.

Dated: June 30, 2015

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge